# JARVE ⫻ KAPLAN
## GRANATO LLC
### ATTORNEYS AT LAW



**MATI JARVE** (NJ,PA,AZ) *
mjarve@nj-triallawyers.com

**MICHAEL A. KAPLAN** (NJ,DC)
mkaplan@nj-triallawyers.com

**ROSALIND T. KAPLAN** (NJ,PA)
rtkaplan@nj-triallawyers.com

**ANTHONY GRANATO** (NJ, PA) *
agranato@nj-triallawyers.com

**ADAM M. STARR** (NJ, PA)*
astarr@nj-triallawyers.com

\* CERTIFIED BY THE SUPREME COURT OF
NEW JERSEY AS A CIVIL TRIAL ATTORNEY

10 LAKE CENTER EXECUTIVE PARK
401 ROUTE 73 NORTH, SUITE 204
MARLTON, NEW JERSEY 08053

PHONE 856.235.9500
FAX 856.235.9502/1620
www.nj-triallawyers.com

**OF COUNSEL**
DAVID B. FOX (NJ)
GILLMAN & LEVIN, P.C.

**PHILADELPHIA OFFICE**
1600 MARKET STREET
SUITE 3800
PHILADELPHIA, PA 19103
215.751.1700

**BRIDGETON OFFICE**
856.451.4550

**WOODSTOWN OFFICE**
856.769.9292

**VINELAND OFFICE**
856.896.6090

May 7, 2012

**<u>Via Electronic Filing</u>**
Clerk of Court
U.S. District Court for
The District of New Jersey
Mitchell H. Cohen Building &
U.S. Courthouse
1 John F. Gerry Plaza
Camden, NJ 08101

  RE: **JOE SMITH v. NEW JERSEY STATE POLICE, ET AL.**
     **CIV. ACTION NO.: 09-4268 (JBS)**

Dear Sir/Madam:

  Enclosed herewith is Plaintiffs' Opposition to Defednants' Motion for Partial Summary Judgment.  By copy of this correspondence, we are forwarding the same to defense counsel via electronically and by regular mail.  Thank you.

        Respectfully submitted,

        **JARVE KAPLAN GRANATO, LLC**

        ANTHONY GRANATO

AG/tm
cc: VINCENT J. RIZZO, JR., ESQUIRE, via ELECTRONIC AND REGULAR MAIL

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| BEVERLY SMITH and JOE SMITH<br><br>Plaintiff(s),<br><br>v.<br><br>THE STATE OF NEW JERSEY, THE NEW JERSEY STATE POLICE AND STATE TROOPER RODRIGUEZ AND STATE TROOPER CARLOS RODRIGUEZ, Badge Number 6117, individually and under color of State law, and John Doe and/or John Doe Corporation 1-10 (John Doe and/or John Doe Corporation 1-10 being fictitious names), i/j/s/a/,<br><br>Defendant(s). | CIVIL NO. 09-CV-4268<br><br>ORDER |

AND NOW, this __ day of _____, 2012, upon consideration of the Defendants' Motion for Partial Summary Judgment, and Plaintiff's response thereto, it is hereby **ORDERED** and **DECREED** that said Motion is **DENIED**.

BY THE COURT:

_____
J.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| BEVERLY SMITH and JOE SMITH <br><br> Plaintiff(s), <br><br> v. <br><br> THE STATE OF NEW JERSEY, THE NEW JERSEY STATE POLICE AND STATE TROOPER RODRIGUEZ AND STATE TROOPER CARLOS RODRIGUEZ, Badge Number 6117, individually and under color of State law, and John Doe and/or John Doe Corporation 1-10 (John Doe and/or John Doe Corporation 1-10 being fictitious names), i/j/s/a/, <br><br> Defendant(s). | CIVIL NO. 09-CV-4268 <br><br> **PLAINTIFFS' ANSWER TO DEFENDANTS' ALLEGED "STATEMENT OF UNDISPUTED MATERIAL FACTS"** |

Plaintiffs, Beverly Smith and Joe Smith, by and through their attorneys, Jarve Kaplan Granato, LLC, answer the Defendants' alleged "Statement of Facts" as follows:

1.    Admitted.

2.    Admitted.

3.    Admitted.   However, the entire report of Timothy J. Longo, Sr. is attached hereto as Exhibit "A" and is incorporated in opposition to Defendants Motion for Partial Summary Judgment.

**WHEREFORE**, Defendants' Motion for Partial Summary Judgment should be denied.

JARVE KAPLAN GRANATO, LLC

By: _____

ANTHONY GRANATO
Jarve Kaplan Granato, LLC
10 Lake Center Executive Park
401 Route 73 North, Suite 204
Marlton, NJ 08053
(856) 235-9500
**Attorneys for Claimant**

Dated: May 7, 2012

# EXHIBIT "A"

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF NEW JERSEY

BEVERLY SMITH and JOE SMITH

       Plaintiffs, )

   -vs- )
                      ) Civil Action No. 09-4268

THE STATE OF NEW JERSEY, THE NEW
JERSEY STATE POLICE, STATE TROOPER
RODRIGUEZ, and STATE TROOPER
CARLOS RODRIGUEZ, BADGE NUMBER
6117, Individually and under color of State law,

       Defendants. )

**Expert Report of Timothy J. Longo, Sr.**

1.  My name is Timothy J. Longo, Sr.. I have been actively involved in police practices and law enforcement since 1981. Currently, I serve as the Chief of Police for the City of Charlottesville, Virginia. In March of 2000, I retired from the Baltimore City Police Department as a Police Colonel and the Chief of the department's Technical Services Bureau. Since my retirement from Baltimore City, and during my tenure as Chief of Police in Charlottesville, I have been involved in police and law enforcement practices as a private consultant regarding law enforcement issues.

2.  I matriculated through the ranks of the Baltimore City Police Department, ultimately achieving the rank of Colonel overseeing the department's Technical Services Bureau. During my almost 19 year tenure with the department I served

1

in the following capacities; Police Cadet assigned to the Central Records and Internal Investigations Division, Patrol Officer assigned to the Central District, Plain Clothes Police Officer assigned to the Central District Vice Enforcement Unit, Police Agent assigned to the Education and Training Division as the agency's primary law instructor for basic and in-service training, Police Sergeant assigned to the Central District cell-block and later the Command Investigation Section, Police Lieutenant assigned to the Northwestern District, Detective Lieutenant assigned to the Internal Investigations Division/Special Investigations Section, Major/Director assigned to the Communications Division, Major/District Commander assigned to the Southeastern District, Chief of Staff to the Police Commissioner, and Colonel/Chief of Technical Services.

3. With regard to use of force, and the evaluation of force, my training and experience in the following operational and substantive areas of law enforcement uniquely qualify me to render an expert opinion in the areas of use of force and use of force investigation; patrol officer, drug and vice enforcement officer, police academy instructor, patrol shift commander, internal affairs detective lieutenant, district commander of a patrol district located within a large urban city, and as the Chief of Police of a municipal law enforcement agency.

4. In addition to those areas highlighted in paragraph 3, I have participated in agency audits with respect to the Ft. Lauderdale, Florida Police Department, Hartford, Connecticut, Police Department, and the Belmont, Ohio Sheriff's office. In each of these, I participated in the evaluation of policies, procedures,

2

and investigative protocols with regard to use of force and use of force investigations. Lastly, I served as the Internal Affairs and Use of Force monitor with regard to the Memorandum of Agreement by and between the Department of Justice and the City of Cincinnati and the Cincinnati Police Department.

5.  Immediately following my retirement from Baltimore City, I served as a consultant and Project Manager for a global strategic management consulting firm in Rockville, Maryland. During that time my principal responsibilities included managing a project within the District of Columbia Police Department. My responsibilities also included audits of the Denver Police Department's Internal Affairs Division, the Pasadena Police Department's Communications Division, and the District of Columbia Police Department's Communications Division. I resigned my position to accept an appointment as the Chief of Police in Charlottesville, Virginia on February 26, 2001.

6.  My education includes a Bachelor of Science Degree from Towson University in Baltimore, Maryland, and a Juris Doctor Degree from the University of Baltimore, School of Law.

7.  From approximately 1995 until 2000 I served as an adjunct faculty member at Towson University and instructed undergraduate classes in Police Administration and Conflicts in Policing. I have guest lectured at the University of Virginia, Darden School of Business, the University of Virginia School of Law, and the Sorensen Institute for Political Leadership at the University of Virginia. Additionally, I have served on the adjunct faculty of the Institute for

3

Law Enforcement Administration at the Center for American and International Law in Plano, Texas for approximately 13 years.

8. I am the co-author of the Virginia Search and Seizure Manual for Law Enforcement Officers, 5th Edition, published by the Lexis-Nexis Company, and I am the sole author of the 6th edition that was released last month.

9. In addition to my practical law enforcement experience and legal education, I have instructed courses in Substantive and Procedural Criminal Law, Police Ethics, Internal Affairs, Constitutional Law, and Liability in Law Enforcement Operations.

10. In the formulation of this report, I have reviewed the following materials related to this case; Plaintiff's complaint, sworn depositions of Plaintiffs Beverly Smith and Joe Smith, sworn deposition of Plaintiffs' daughter/sister, Beverly Smith, Defendant Carlos Rodriquez's sworn deposition, Jessica Adams' sworn deposition, Defendants, State of New Jersey and New Jersey State Police's Initial Disclosures and discovery materials submitted by the Defendants which have been bated Stamped NJSP-SMITH1 through NJSP-SMITH509, Plaintiffs' initial discovery requests to Defendants and Defendants answers thereto, copies of photographs of Joe Smith and two emergency room records from Virtua Hospital, Camden for 06/24/07 date of service.

11. This expert report is based upon the materials provided to this date as set out in paragraph 10. The opinions presented in this report are based upon my specialized experience, training and knowledge of police practices as well as my continued research and work with law enforcement nationally. This work

4

includes the leadership and management of a municipal police agency where I currently serve as the Chief Law Enforcement officer, my previous experience commanding various component parts of a very large municipal police agency, conducting training for law enforcement around the United States as well as auditing the policies and operations of law enforcement agencies around the United States. My opinions are provided with a reasonable degree of certainty within the fields of law enforcement, police activity and police administration and supervision. I am familiar with police civil litigation and know the normal phases of discovery. With this in mind I recognize that there may be additional documentation as the case progresses. In the event that additional material is produced I shall be prepared to supplement this report.

12. At the outset it is important to note that this report is based upon the facts as presented by the material and specifically avoids drawing conclusions based upon credibility issues of the parties.

## The Facts

13. On June 24, 2007, at approximately 12:05 a.m., Detective Carlos Rodriguez, a duly sworn officer employed by the New Jersey State Police, was in the area of Chase and Louis Streets, in the City of Camden, New Jersey, conducting a narcotics investigation.[1]

14. While at that location, Detective Rodriguez is reported to have heard "yelling, cursing, and furniture being moved"[2] from inside of a home located some 50

---

[1] See, Sworn Deposition of Detective Carlos Rodriguez.
[2] Id. at page 40.

5

yards from the location where Detective Rodriguez was stationary and conducting his investigation.

15. Detective Rodriguez also reported having heard a voice from within the home request for someone to call the police.[3]

16. According to Detective Rodriguez, he and Trooper B. Carswell (#5924), also a duly sworn member of the New Jersey State Police, approached the home located at 1216 Chase Street, the location from which the detective believed the noise to be coming from.

17. The officers climbed up a few front steps that led to the front door of the residence, and without knocking and announcing their presence, Detective Rodriguez opened the front door.[4]

18. Upon opening the door to the residence, Detective Rodriguez observed a woman trying to separate two male subjects, later determined to be her adult children.[5]

19. Detective Rodriguez did not observe the subject's engaged in a physical altercation, he did not observe any weapons, and he did not observe any persons on the scene that appeared injured.[6]

20. Nor did Detective Rodriguez observe any disruption to the home which would have been consistent with a fight or struggle that may have taken place.[7]

21. Absent the presence of any known exigencies, consent of the property owner, or a duly authorized warrant, Detective Rodriguez and Trooper Carswell entered

---

[3] Id. at page 42.
[4] Id. at page 42 and 43.
[5] Id. at page 43.
[6] Id. at page 47.
[7] Id. at page 90.

the home and engaged the occupants; one of whom was Joe Smith, son of the property owner, Beverly Smith.

22. There is a material dispute with regard to the arrest of Joe Smith and the level of force used against him by the officers. However, what is not in dispute is that Joe Smith was forcibly taken to the ground by officers on the scene.[8]

23. Also in dispute is whether Mr. Smith made any attempts whatsoever to resist the troopers who were attempting to handcuff him,[9] and whether Mr. Smith was struck repeatedly by the troopers while on the ground.[10]

24. What is not in dispute is that after being forcibly taken to the ground by the troopers, a chemical irritant was used by the police and sprayed into the face of Mr. Smith.[11]

25. At some point thereafter, Mr. Smith was taken into custody and charged with disorderly conduct, obstructing administration of law or other government function, and resisting arrest; charges that were dismissed.[12]

26. The balance of my report will focus on the following four issues: (1) Whether the officer's entry into Beverly Smith's home was reasonable and consistent with generally accepted policing practices and standards, (2) Whether the arrest of Joe Smith was reasonable and consistent with generally accepted policing practices and standards, (3) Whether the use of force used against Joe Smith was reasonable and consistent with generally accepted policing practices and

---

[8] Id. at page 66. Also see, Sworn Deposition of Joe Smith at page 53.  Also, See, NJSP Investigation Report, A010-2007-00238, NJSP-SMITH 3.
[9] Id. at 73. Also see, Sworn Deposition of Joe Smith at pages 53-56.
[10] See, Sworn Deposition of Joe Smith at page 57; Sworn Deposition of Beverly Smith (daughter) at page 27, and; Sworn Deposition of Beverly Smith (mother) at page 64.
[11] See, Sworn Deposition of Detective Carols Rodriguez at pages 75-76.
[12] Id. at page 79.

7

standards, and (4) Whether the arresting officer and the New Jersey State Police (The State of New Jersey) were responsible for the constitutional injuries suffered by Beverly and Joe Smith.

## **Home Entry**

27. Police officers in the United States of America are trained in various aspects of constitutional law, and particularly as it relates to the manner in which they carry out their public duties and responsibilities.

28. Individual liberties secured by our Constitution are impacted through a variety of law enforcement activities; arrest, search and seizure, use of force, confessions, identifications, and a host of other due process considerations.

29. However, the one area of constitutional importance that is most frequently triggered by police action is the Fourth Amendment; *"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."*[13]

30. The Fourth Amendment is generally applicable when a government agent, or presumably, someone acting at the behest of the government initiates a search in an area where someone has a reasonable expectation of privacy.[14]

31. After establishing Fourth Amendment applicability, the next relevant inquiry is to determine whether the Fourth Amendment has been satisfied. There are

---

[13] United States Constitution, Fourth Amendment.   It also must be noted that the New Jersey State Constitution has a like provision at Article one paragraph 7.
[14] Virginia Search and Seizure for Law Enforcement Officers, Fifth Edition, Timothy J. Heaphy and Timothy J. Longo, Sr., LexisNexis, Charlottesville, Virginia, at page 1.

several ways in which law enforcement officers do so: (1) Probable Cause, or a Probable Cause exception, (2) a Warrant, or a Warrant exception, (3) Exigent Circumstances, or (4) Good Faith.[15]

32. When it comes to entries into the home, the police are generally limited to one of three ways: (1) a warrant[16], (2) voluntary consent given by someone who is authorized or apparently authorized to give consent[17], or (3) exigent circumstances.[18]

33. In the instant matter, Detective Rodriguez asserted a need to enter the home of Beverly Smith based on the existence of some emergency that according to the Plaintiff's, simply did not exist.

34. Therefore, the issue to be resolved is whether the entry was reasonable under the emergency aide exception to the warrant requirement?

35. Initially, it is important to note that securing the sanctity of a private citizen's home has been found to be the greatest singular purpose of the Fourth Amendment. Miller v. United States.[19]

36. Two recent United States Supreme Court cases are especially instructive in evaluating whether Detective Rodriguez's entry into Beverly Smith's home satisfied the emergency aid exception, and thus was reasonable and consistent

---

[15] Id.

[16] See, Payton v. New York, 445 U.S. 573 (1980). Also, See, Steagald v. United States, 451 U.S. 204 (1981).

[17] See, Illinois v. Rodriguez, 497 U.S. 177 (1990) (Apparent Authority). Also see, Georgia v. Randolph, ___ U.S. ____ (2006); United States v. Matlock, 415 U.S. 164 (1974). (Common Authority, Use, or Control).

[18] See, Vale v. Louisiana, 399 U.S. 30 (1970) (threat of destroying evidence creates exigency). Also see, Welsh v. Wisconsin, 466 U.S. 740 (1984) (exigency is not created when the suspect being pursued is suspected of committing a minor, non-jailable offense), Mincey v. Arizona, 437 U.S. 385 (1978) (police are not barred from entering a home when they reasonably believe a person within is in need of immediate aid).

[19] 357 U.S. 301 (1958).

with generally accepted policing practices and practices; <u>Brigham City v. Stuart</u>[20], and <u>Michigan v. Fisher</u>[21]

37. In both <u>Brigham City v. Stuart</u> and <u>Michigan v. Fisher,</u> the police observed some evidence of an assault, injury, or other facts that would result in an objectively reasonable belief that someone inside the home needed assistance.

38. In <u>Stuart</u>, officer's observed a physical altercation between a juvenile subject and several adults. In addition, the officer's observed and an injured person who was expectorating blood into a sink.

39. In <u>Fisher,</u> an officer responding to some type of disorder observed evidence outside the home; a freshly damaged truck, a broken fence, blood on the exterior of the truck, and blood stained clothes inside the truck.

40. The officer also discovered blood on the door to the home, and could plainly see through a window that Fisher had blocked at least one of the doors and was bleeding.

41. The facts in both <u>Stuart</u> and <u>Fisher</u> are very different from those presented to Detective Rodriguez in the early morning of June 24, 2007.

42. Detective Rodriguez has asserted that yelling and specifically, someone who was asking for police assistance, gave rise to an objectively reasonable belief that someone inside the house was in need of immediate aid.

43. However, the objective reasonableness of his actions diminished when he, without knocking on the door or otherwise announcing himself before he

---

[20] 547 U.S. 398 (2006).
[21] 558 U.S. _____ (2009).

entered, opened the unlocked door and observed no altercation, no weapons, no injury, and no disarray.

44. Unlike the officers in both <u>Stuart</u> and <u>Fisher</u>, Detective Rodriguez had no objective basis, sans words heard from a distance of 50 yards, to support an objectively reasonable belief that someone inside was in need of emergency aid.

45. Therefore, Detective Rodriguez warrant-less entry into Beverly Smith's home in the early morning hours of June 24, 2007, was unreasonable and inconsistent with generally accepted policing practices and standards.

### The Arrest

46. Joe Smith, while inside his mother's home in the early morning hours of June 24, 2007, was arrested for disorderly conduct and obstructing administration of law or other government function.

47. It appears from the sworn deposition of Detective Rodriguez that the evidence in support of such a charges arose from Joe Smith cursing at one of the troopers and challenging their authority to be inside his home[22] There were simply no other factors that the detective provided that would otherwise support a disorderly conduct charge or an obstructing administration of law or other government function charge.[23]

48. The Disorderly Conduct statute for the State of New Jersey is set out in N.J.S.A. 2C:33-2. It defines disorderly conduct as follows: *"a. Improper behavior. A person is guilty of a petty disorderly offense, if with purpose to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof he (1)*

---

[22] See, Sworn Deposition of Detective Carlos Rodriguez, pages 63-65.
[23] Id. at page 65.

11

*Engages in fighting or threatening, or in violent or tumultuous behavior; or (2) Creates a hazardous or physically dangerous condition by acts which serves no legitimate purpose of the actor."*

*"b. Offensive language. A person is guilty of a petty disorderly persons offense if, in a public place, and with purpose to offend the sensibilities of a hearer or in reckless disregard of the probability of so doing, he addresses unreasonably loud and offensively coarse or abusive language, given the circumstances of the person present and the setting of the utterance, to any person present."*

*"Public means affecting or likely to affect persons in a place to which the public or a substantial group has access; among the places included are highways, transport facilities, schools, prisons, apartment houses, places of business or amusement, or any neighborhood."*

49. Before offering any opinion as to whether Joe Smith's behavior constituted disorderly conduct or otherwise made his arrest reasonable in light of the facts presented, a brief history and understanding of Disorderly Conduct statutes, generally, may be helpful in this analysis.

50. Disorderly Conduct statutes have their origin in the common law, and their implications on First Amendment rights are clear and have been the subject of legal opinions since the 1940's.[24]

51. The Supreme Court has been quick to point out that while our Constitution provides, among other things, for the freedom of speech and the freedom of

---

[24] See <u>Chaplinksy v. New Hampshire</u>, 315 U.S. 568 (1942).

assembly[25], not all words and not all conduct is protected under the First Amendment. "Fighting words", for example, are not protected speech; words that by their very nature inflict injury or incite immediate breach of the peace.[26]

52. Moreover, the Court has required that for mere words to rise to the level of disorderly conduct there must be some evidence that people in substantial numbers would be provoked into some kind of physical action.[27] The fact that an audience may take offense to certain words, actions, or expression of ideas is not a sufficient basis to quell First Amendment rights.[28]

53. A breach of the public peace is not a breach of the officer's peace.  This is because the "rights of individuals to verbally oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state."[29]

54. But when an arrest occurs in the aftermath of an exchange between a citizen who verbally opposes or challenges a police officer or the action the officer has undertaken, as in this case, the question that immediately arises is whether the conduct sufficiently satisfied all of the elements of the relevant statute(s), or whether the arrest was a quick, spiteful, and poorly thought-out response to a perceived "contempt of cop" situation.

---

[25] First Amendment, United States Constitution.
[26] Chaplinsky v. New Hampshire, 315 U.S. 568 (1942).
[27] Cohen v. California, 403 U.S. 15 (1971).
[28] See Texas v. Johnson, 491 U.S. 397 (1989).
[29] Houston v. Hill, 482 U.S. 451 (1987).

13

55. The term "contempt of cop" should be well known and sufficiently understood throughout the law enforcement community; it has been a term frequently used and sometimes debated for the greater part of my 29 years in law enforcement. Over the past year, it has been both a term and concept that has become part of a larger national discussion.

56. On July 16, 2009, Sergeant James Crowley, an eleven-year veteran of the Cambridge, Massachusetts Police Department was dispatched to a breaking and entering call. Upon his arrival, he was met by Harvard Professor Henry Louis Gates. Professor Gates, who had been out of town, was returning home and along with another male, was struggling with a front door that appeared to be stuck. When someone, presumably a neighbor, observed their actions he or she believed that a breaking and entering was in progress and phoned the police.

57. Within six minutes of Sergeant Crowley's arrival on the scene, Professor Gates was in custody and was charged with disorderly conduct. The charges, much like those applied to Joe Smith, were later dismissed.[30]

58. The arrest of Professor Henry Louis Gates ignited a discussion that has gone beyond the dinner table and has found its way into the White House Rose Garden. More important than Presidential involvement in resolving that specific matter in controversy, is the broader discussion that has taken place within the law enforcement community regarding "contempt of cop". Earlier this year the nations top law enforcement leaders, legal scholars, and practitioners were

---

[30] CNN.com, Tuesday, July 21, 2009.

14

brought together to study the Cambridge arrest specifically, and its implications to both law enforcement and citizens generally.[31]

59. The report, principally coordinated by the Police Executive Research Forum, provides for a comprehensive review of the interaction between Sergeant Crowley and Professor Gates in the moments that led to the professor's arrest. Most importantly, the report highlights several areas that are relevant to understanding the complexity of police-citizen interactions. These areas are also useful when applied to the instant matter.

60. One such area of the report describes the notion of both "legitimacy" and "procedural justice". Legitimacy has to do with the judgments that ordinary people, like Beverly and Joe Smith for example, make about the rightfulness of police conduct and the extent to which they support the police. Procedural Justice has to do with whether the police treat people with dignity and respect. Balancing the two with the tactical and safety considerations of the police is critical.[32] The balance also impacts, not just the immediate police-citizen interaction, but has direct bearing on the broader relationship between the police department and the community it serves.

61. I suppose Joe Smith's conduct on the morning of June 24, 2007, was disturbing to the trooper's who were on the scene; they were allegedly cursed at and their

---

[31] Missed Opportunities, Shared Responsibilities: Final Report of the Cambridge Review Committee, June 15, 2010.
[32] Id.

authority was challenged.[33] However, there is no testimony whatsoever that any member of the public was affected by Joe Smith's behavior.

62. Nor is there any testimony that Joe Smith's words or actions incited anyone to hostility or lawlessness.

63. Joe Smith and his brother were engaged in a heated discussion; no more, no less. Their neighbors did not phone the police, their mother and sister were not frightened, threatened, or otherwise affected by their behavior; and there is no testimony that the two ever engaged in a physical confrontation. Even the threat of a confrontation remains in dispute.[34]

64. Much like in the case of Sergeant Crowley and Professor Gates, Detective Rodriguez failed to take steps to "ratchet down"[35] the situation. Once they opened the door and discovered that no one was in need of emergency aid, Officer Rodriguez did not take the opportunity to explain to Beverly Smith and her family as to why he took the steps he did. Had he done so, Joe Smith might not have challenged the police's authority and might never have been the subject of the unlawful and unreasonable arrest.

65. In Groman v. Township of Manalapan[36] a New Jersey case, the police came to the home after they were called about the husband home owner who allegedly suffered a minor stroke. The husband became resistant to the police and he was

---

[33] It is important to note that the precipitating event before Mr. Smith words to the police was the unannounced, by knocking or otherwise, entry into the family home by the police.

[34] See, Missed Opportunities, Shared Responsibilities: Final Report of the Cambridge Review Committee, June 15, 2010 at page 60. See also, Sworn Deposition of Joe Smith at page 45.

[35] There is a real question as to whether the police "ratcheted up" the situation by not knocking on the door before entering the home. At the very least, the officer should have recognized that the unannounced entry would be perceived as an invasion of privacy and he should have given due consideration and reacted differently to the unfavorable response to his unannounced entry.

[36] 47 F.3d 628(3rd Cir. N.J. 1995).

16

charged with disorderly conduct. The Court found that the husband could not have committed disorderly conduct in his own home.

66. The <u>Gorman</u> court cited a case that is strikingly similar to this case. In <u>Whittington v. State</u>[37] the defendant yelled at a police officer who had gone to his house because of a report of a domestic disturbance there. The defendant had apparently punched his sister. He was charged with and convicted of disorderly conduct. The Court reversed the conviction stressing that "the forum employed by the defendant was his own home." The conviction was reversed on the basis that the defendant's behavior was not sufficiently public.

67. There is simply no testimony whatsoever that Joe Smith's conduct rose to the level of disorderly conduct; thus, probable cause did not exist to support an arrest.

68. It equally true that there was no probable cause to arrest Mr. Smith on charge of obstructing administration of law or other governmental function. The New Jersey statute provides: "A person commits an offense if he purposely obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from lawfully performing an official function be means of flight, intimidation, force, violence, or physical interference or obstacle, or by means of any independently unlawful act."[38]

69. In the New Jersey case <u>State v. Barlow</u>[39] a defendant who asserted his rights under the New Jersey Constitution by refusing to admit police officers, who had no warrant to search his home and no probable cause to believe criminal activity

---

[37] 634 N.E. 2nd 526 (Ind. Ct. App. 1994).
[38] N.J. Sat. Ann. § 2C:29-1.
[39] 284 N.J. Super. 356 (Law D. 1995).

17

was occurring in the home, could not be punished for obstructing the administration of law under the New Jersey statute in spite of the fact that he slammed his door in the officer's face.

70. Disorderly conduct and the obstruction statute are two distinct violations, and accordingly, a disorderly conduct charge cannot be used to "boot strap" an obstruction charge. There is no evidence that Mr. Smith obstructed the administration of law, and as a result, there was no probable cause to arrest him on the charge.

71. There is no basis of fact to support the charges of disorderly conduct, obstruction, or resisting arrest, and that an arrest based on the facts presented is inconsistent with generally accepted policing practices and standards.

**The Use of Force**

72. The next question is whether the use of force used against Joe Smith, taking him to the ground, striking him, and using a chemical irritant on his face, was reasonable and consistent with generally accepted policing practices.

73. Officers throughout the United States are trained in two formulas with respect to use of force decision making and justification. The first is a three-part test which parallels the mandates announced by the United States Supreme Court in *Graham v. Connor.*[40] Officers are to consider the seriousness of offense; whether or not the subject poses a physical threat to the officer or anyone else and finally whether the subject is actively resisting or attempting to evade arrest by flight.[41]

---

[40] *Graham v. Connor*, 490 U.S. 386 (1989).
[41] Also, See, Minneapolis Police Department's Use of Force Policy, 5-303.

18

74. The second formula is the "Use of Force Continuum." While agencies utilize different force continuum models, all of these models recognize that officers have various subject control tactics available to them and that these tactics range from a low-level such as officer presence and verbal commands to the highest level which is deadly force. The use of force continuum is not a ladder which must be climbed step by step. Instead it is a presentation of various force options, each of which must be objectively reasonable under the circumstances which the officer is faced with. It is with these two formulas in mind that I evaluate and opine as to whether the use of force was within the generally accepted practice, standards, training, policy, and legal mandates.

75. As I have previously concluded, the entry into Ms. Smith's home was inconsistent with established law and generally accepted policing practices and standards. Further, that the words and actions of Joe Smith in the early morning of June 24, 2007, failed to rise to the level of disorderly conduct. Thus, his arrest was both unreasonable and inconsistent with generally accepted policing practices and standards. Therefore, it is logical to conclude that any use of force against him would also be unreasonable and inconsistent with generally accepted policing practices and standards.

76. There is no testimony whatsoever that Joe Smith struck, threatened to strike, or otherwise advanced an attack on the troopers who improperly entered his home.

77. While he may have challenged their authority in a manner that they deemed offensive or disrespectful, there is no testimony that his words or actions gave rise to an imminent threat of harm to the officers.

19

78. Detective Rodriguez acknowledged that at no time did he ever observe either of the two brothers engaged in a physical confrontation.

79. Applying Graham's three prongs to this particular fact pattern, the actions initiated by the troopers and the use of force they used in taking Mr. Smith to the ground, striking him, and deploying chemical irritant to his face fail in every aspect of the analysis.

80. Joe Smith committed no crime. Even if his conduct rose to the level of being disorderly, there is no testimony that his words or actions incited violence or hostility in others. Thus, the nature of the offense in dispute is neither violent nor serious.

81. Joe Smith may have been angry that the troopers had entered his mother's home improperly. He may even have challenged their authority. The law has clearly established his right to do so.[42] But, there is no testimony whatsoever that he by word or deed did anything to create an objective belief that he posed any risk of danger to the troopers or others on the scene.

82. While there is testimony by Detective Rodriguez the Mr. Smith was resisting by kicking his legs when forcibly taken to the ground, the troopers' collective decision to do so was improper based on the facts and circumstances they were confronted with at the time.

83. Therefore, the use of force used against Joe Smith in the early morning hours of June 24, 2007, was unreasonable and inconsistent with generally accepted policing practices and standards.

---

[42] Scc, Houston v. Hill, supra.

20

### <u>Officer Rodriguez's responsibility and the vicarious liability of the New Jersey State Police Department</u>

84. Officer Rodriguez entered the home and was the arresting officer. He had actual knowledge of all of the arresting events and acquiesced concerning all of them. He acted in concert with all of the officers involved. He is responsible for all of the arresting events.[43]

85. The New Jersey State Police Department is responsible and vicariously liable for the actions of all of its officers participating in all of the arresting events involving Mr. Smith under both the New Jersey State Constitution[44] and the New Jersey Civil Rights Act.[45]

86. The Constitution of the State of New Jersey provides that:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no warrant shall issue except upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the papers and things to be seized.[46]

87. The New Jersey Supreme Court has held that the Constitution of the State of New Jersey may provide a private cause of action premised upon alleged violations of the State constitution.[47] The cause of action arising under the State constitution provides for the "full scope of remedial relief necessary to make

---

[43] See, <u>Rode v. Dellarciprete</u>, 845 F. 2d 1195 (3rd Cir. 1988), (concluding that personal involvement can be shown through personal direction or of actual knowledge and acquiescence).
[44] N.J. Const., Art. 1, P 7.
[45] N.J. Sat. Ann. § 10:6-1 and § 10:6-2.
[46] N.J. Const., Art. 1, P 7.
[47] See <u>Peper v. Princeton Univ. Bd. of Trustees, 77 N.J. 55, 76-80, 389 A.2d 465.</u>

21

[the plaintiff] whole" and provides protections "analogous or superior" to those afforded under the Federal Constitution.[48]

88. The Court in <u>Gibson v. Superintendent of New Jersey Department of Law and Public Safety-Division of State Police, et. al.</u>[49] confirmed that unlike the Federal Civil Rights prohibition of liability based on principals of *respondeat superior*[50], there is no such restriction for claims that the New Jersey Constitution was violated.

89. Officer Rodriguez was directly involved in all arresting events and he is thereby responsible for all of the wrongful arresting actions. Likewise, the New Jersey State Police Department (The State of New Jersey) is responsible for the wrongful actions of its police officers.

<u>**Conclusion**</u>

90. Having reviewed the materials in this case and carefully considered them in the context of my training, experience, and knowledge of generally accepted policing practices and standards in the United States of America, I am of the opinion that: (1) The entry into the home of Beverly Smith was unreasonable, improper, and inconsistent with established law and generally accepted policing practices and standards, (2) The arrest of Joe Smith was unreasonable, improper, and inconsistent with established law and generally accepted policing practices and standards, (3) The use of force used against Joe Smith was unreasonable, improper, and inconsistent with established law and generally accepted policing practices and standards, (4) That the improper entry, arrest, and use of force

---

[48] <u>Id. at 79, 86</u>.
[49] 2009 U.S. Dist. Lexis 26829 (Dist. N.J. 2009).
[50] See, <u>Monell v. New Yourk City Dept. of Social Services</u>, 436 U.S. 658 (1978).

22

were the proximate cause of Plaintiff's injuries, and (5) Officer Rodriguez and the State of New Jersey are responsible for the unlawful conduct.

91. At this stage of my review I do not know if I may be asked to review additional documents.  Should I be asked to review any additional documents I will be prepared to render additional opinions or supplement the opinions stated within this report.

92. At this point in the development of this case I do not know whether I will be using any demonstrative aids during my testimony.  Should I decide to use any such tool I will assure that they are made available for review, if requested, prior to their use.

93. My fees are $2500 for a deposition in Charlottesville, Virginia or $2500 per day plus expenses for services away from Charlottesville, Virginia including depositions and trial appearances.

This report is signed under penalty of perjury on this 11th day of October, 2010 in Charlottesville, Virginia.

/s/ Timothy J. Longo, Sr.

23

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

---

BEVERLY SMITH and JOE SMITH

        Plaintiff(s),

v.

THE STATE OF NEW JERSEY, THE
NEW JERSEY STATE POLICE AND
STATE TROOPER RODRIGUEZ AND
STATE TROOPER CARLOS
RODRIGUEZ, Badge Number
6117, individually and under
color of State law, and John
Doe and/or John Doe
Corporation 1-10 (John Doe
and/or John Doe Corporation
1-10 being fictitious
names), i/j/s/a/,

        Defendant(s).

CIVIL NO. 09-CV-4268

---

**PLAINTIFFS BEVERLY SMITH AND JOE SMITH'S OPPOSITION TO
DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
PURSUANT TO FED. R. CIV. P. 56(a) AND L. CIV. R. 56.1**


**MOTION RETURNABLE May 21, 2012**

TABLE OF CONTENTS

<u>Page</u>

APPENDIX TABLE OF CONTENTS ..................................... i

TABLE OF AUTHORITIES/ COURT RULES AND STATUTES ............... ii

I.   STATEMENT OF FACTS ......................................... 1

II.  LEGAL ARGUMENT

     A. STANDARD FOR SUMMARY JUDGMENT .......................... 3

     B. THE STATE OF NEW JERSEY AND THE NEW JERSEY STATE
        POLICE ARE VICARIOUSLY LIABLE FOR THE ACTIONS OF THE
        NEW JERSEY STATE POLICE DEPARTMENT AND NEW JERSEY
        STATE TROOPERS PURSUANT TO THE NEW JERSEY CIVIL
        RIGHTS ACT AND THE NEW JERSEY CONSTITUTION ............. 4

     C. THE DEFENDANT RODRIGUEZ, WHO IS AN ADULT INDIVIDUAL,
        VIOLATED THE PLAINTIFFS CIVIL RIGHTS AND THE
        PLAINTIFFS HAVE CLAIMS AGAINST HIM PURSUANT TO 42
        U.S.C. § 1983, THE NEW JERSEY CIVIL RIGHTS ACT AND
        THE NEW JERSEY STATE CONSTITUTION, AND HENCE,
        DEFENDANT RODRIGUEZ, AN ADULT INDIVIDUAL, IS NOT
        ENTITLED TO SUMMARY JUDGMENT ........................... 5

III.  CONCLUSION ............................................. 7

i

## TABLE OF AUTHORITIES

### CASES

First National Bank v. Cities Service Co., 391 U.S. 263
(1968) ................................................... 3

Gavin v. People's Natural Gas Co., 613 F. 2d 482 (3d Cir.
1993) .................................................. 3

Gibson v. Superintendent of New Jersey Department of Law and
Public Safety-Division of State Police, et al., 2009 U.S.
dist. Lexis 226829 (Dist. N.J. 2009) ........................ 5

Monell v. New Yourk City Dept. of Social Services, 436 U.S. 658
(1978) ................................................. 5

Peper v. Princeton Univ. Bd. Of Trustees, 77 N.J. 55, 76-80, 389
A.2d 465 (1978) ...................................... 4, 5

### STATUTES

N.J. Const., Art. 1, P 7 ................................ 4

N.J. Stat. Ann. § 10:6-1 .............................. 4

N.J. Stat. Ann. § 10:6-2 .............................. 4

42 U.S.C. § 1983 .................................... 5, 6

ii

I.    STATEMENT OF FACTS

On June 24, 2007, at approximately 12:05 a.m., Detective Carlos Rodriguez, a duly sworn officer employed by the New Jersey State Police, was in the area of Chase and Louis Streets, in the City of Camden, New Jersey, conducting a narcotics investigation.

While at that location, Detective Rodriguez is reported to have heard "yelling, cursing, and furniture being moved" from inside of a home located some 50 yards from the location where Detective Rodriguez was stationary and conducting his investigation.    Detective Rodriguez also reported having heard a voice from within the home requesting someone to call the police.    According to Detective Rodriguez, he and Trooper B. Carswell, also a duly sworn member of the New Jersey State Police, approached the home located at 1216 Chase Street, the location from which the detective believed the noise to be coming from.

The officers climbed up a few front steps that led to the front door of the residence, and without knocking and announcing their presence, Detective Rodriguez opened the front door.    Upon opening the door to the residence, Detective Rodriguez observed a woman trying to separate two male subjects, later determined to be her adult children.    Detective Rodriguez did not observe the subjects engaged in a physical altercation, he did not

observe any weapons, and he did not observe any persons on the scene that appeared injured. Nor did Detective Rodriguez observe any disruption to the home which would have been consistent with a fight or struggle that may have taken place.

Absent the presence of any known exigencies, consent of the property owner, or a duly authorized warrant, Detective Rodriguez and Trooper Carswell entered the home and engaged the occupants; one of whom was Joe Smith, son of the property owner, Beverly Smith. There is a material dispute with regard to the arrest of Joe Smith and the level of force used against him by the officers. However, what is not in dispute is that Joe Smith was forcibly taken to the ground by officers on the scene. Also in dispute is whether Mr. Smith made any attempts whatsoever to resist the troopers who were attempting to handcuff him, and whether Mr. Smith was struck repeatedly by the troopers while on the ground. What is not in dispute is that after being forcibly taken to the ground by the troopers, a chemical irritant was used by the police and sprayed into the face of Mr. Smith. At some point thereafter, Mr. Smith was taken into custody and charged with disorderly conduct, obstructing administration of law or other government function, and resisting arrest; charges that were dismissed.

Plaintiffs assert that the Defendants had no right to enter the home unannounced and without knocking on the door.

2

Furthermore, even if the Plaintiff, Mr. Smith, was disrespectful to the police after they entered his family home, there was no basis to arrest him for disorderly conduct.  There is no such thing as disorderly conduct in your own home and an arrest in this regard was a violation of the civil rights of the New Jersey citizen Plaintiff.

The Defendants are not entitled to Partial Summary Judgment and their Motion should be denied.

## III. LEGAL ARGUMENT

### A. STANDARD FOR SUMMARY JUDGMENT

Whether summary judgment is appropriate in a case is a question to be decided upon the particular facts of that case. First National Bank v. Cities Service Co., 391 U.S. 253 (1968) Summary Judgment is inappropriate if there remains a genuine issue as to any material fact.  Gavin v. People's Natural Gas Co., 613 F. 2d 482(3d Cir. 1993)  Thus, the court must construe all facts and inferences in a light most favorable to the non-moving party. Applying this standard makes it clear that there are, at the very least, genuine issues of material fact concerning the Defendants' actions in violating the civil rights of the Plaintiffs.

B. **THE STATE OF NEW JERSEY AND THE NEW JERSEY STATE POLICE ARE VICARIOUSLY LIABLE FOR THE ACTIONS OF THE NEW JERSEY STATE POLICE DEPARTMENT AND NEW JERSEY STATE TROOPERS PURSUANT TO THE NEW JERSEY CIVIL RIGHTS ACT AND THE NEW JERSEY CONSTITUTION.**

The Defendants do not dispute the fact that the State of New Jersey and the New Jersey State Police are vicariously liable for the actions of their employees, State Police Troopers, pursuant to the New Jersey Civil Rights Act and the New Jersey Constitution.

The New Jersey State Police Department is responsible and vicariously liable for the actions of all of its officers participating in all of the arresting events involving Mr. Smith under both the New Jersey State Constitution, N.J. Const., Art. 1, P 7 and the New Jersey Civil Rights Act, N.J. Sat. Ann. § 10:6-1 and § 10:6-2.

The Constitution of the State of New Jersey provides that:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no warrant shall issue except upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the papers and things to be seized.

N.J. Const., Art. 1, P 7.

The New Jersey Supreme Court has held that the Constitution of the State of New Jersey may provide a private cause of action premised upon alleged violations of the State constitution. See

4

Peper v. Princeton Univ. Bd. of Trustees, 77 N.J. 55, 76-80, 389 A.2d 465 (1978)  The cause of action arising under the State constitution provides for the "full scope of remedial relief necessary to make [the plaintiff] whole" and provides protections "analogous or superior" to those afforded under the Federal Constitution.  Id. at 79, 86.

The Court in Gibson v. Superintendent of New Jersey Department of Law and Public Safety-Division of State Police, et. al., 2009 U.S. Dist. Lexis 26829 (Dist. N.J. 2009) confirmed that unlike the Federal Civil Rights prohibition of liability based on principals of respondeat superior. See, Monell v. New Yourk City Dept. of Social Services, 436 U.S. 658 (1978), there is no such restriction for claims that the New Jersey Constitution was violated.

The State of New Jersey and the New Jersey State Police are not entitled to Summary Judgment on Count Two of the Plaintiffs' amended Complaint which asserts a violation of the New Jersey Constitution and the New Jersey Civil Rights Act.

    C. THE DEFENDANT RODRIGUEZ, WHO IS AN ADULT INDIVIDUAL,
       VIOLATED THE PLAINTIFFS CIVIL RIGHTS AND THE
       PLAINTIFFS HAVE CLAIMS AGAINST HIM PURSUANT TO 42
       U.S.C. § 1983, THE NEW JERSEY CIVIL RIGHTS ACT AND
       THE NEW JERSEY STATE CONSTITUTION, AND HENCE,
       DEFENDANT RODRIGUEZ, AN ADULT INDIVIDUAL, IS NOT
       ENTITLED TO SUMMARY JUDGMENT.

The Defendant Rodriguez is an adult individual.  This suit was brought against him.  He was acting under the color of the

law at the time of the events that are the basis of this lawsuit.  His actions violated the civil rights of the Plaintiffs. As a result, the Plaintiffs have claims against him pursuant to 42 U.S.C. § 1983, the New Jersey Civil Rights Act and the New Jersey State Constitution.  It does not matter what capacity he was acting in.  The Defendant is responsible individually.  If the Plaintiffs are successful in proving that the Defendant Rodriguez violated their civil rights and are awarded a judgment, the judgment will be against the Defendant Rodriguez individually.

The Moving Defendants are creating a fiction that somehow Summary Judgment can be awarded in favor of a certain capacity an individual is acting in at the time of the violations. Moving Defendants have not provided any legal support that somehow a court can grant Summary Judgment of a certain capacity an individual is acting in at the time of the violations.

The Defendant Rodriguez is not entitled to Summary Judgment on any of the Counts presented by way of the Plaintiffs' Amended Complaint.  Hence, the Defendant Rodriguez is not entitled to Partial Summary Judgment.

IV.   CONCLUSION

For the reasons set forth above, the Defendants are not entitled Partial Summary Judgment.   Hence, the Defendant's Motion for Partial Summary Judgment should be denied.

**JARVE KAPLAN GRANATO, LLC**

_____

ANTHONY GRANATO
10 Lake Center Executive Park
401 Route 73 North, suite 204
Marlton, NJ 08053
Attorney for the Plaintiff

Dated: May 7, 2012

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| BEVERLY SMITH and JOE SMITH<br><br>        Plaintiff(s),<br><br>v.<br><br>THE STATE OF NEW JERSEY, THE NEW JERSEY STATE POLICE AND STATE TROOPER RODRIGUEZ AND STATE TROOPER CARLOS RODRIGUEZ, Badge Number 6117, individually and under color of State law, and John Doe and/or John Doe Corporation 1-10 (John Doe and/or John Doe Corporation 1-10 being fictitious names), i/j/s/a/,<br><br>        Defendant(s). | CIVIL NO. 09-CV-4268<br><br>CERTIFICATE OF SERVICE OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT |

I, ANTHONY GRANATO, ESQUIRE, hereby certify that I have served all parties with the within and foregoing OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT, electronically and by regular U.S. mail to:

VINCENT J. RIZZO, JR., DEPUTY ATTORNEY GENERAL
STATE OF NEW JERSEY, OFFICE OF THE ATTORNEY GENERAL
DEPARTMENT OF LAW AND PUBLIC SAFETY, DIVISION OF LAW
25 MARKET STREET
P.O. BOX 112
TRENTON, NJ 08625-0112
Attorneys for Defendants

And by delivering the same electronically to:

Office of the Clerk
U.S. District Court for
The District of New Jersey
Mitchell H. Cohen Building &
U.S. Courthouse
4th and Cooper Streets, Room 1050
Camden, NJ 08101

JARVE KAPLAN GRANATO, LLC


ANTHONY GRANATO
10 Lake Center Executive Park
401 Route 73 North, Suite 204
Marlton, NJ 08053
Attorney for Plaintiff

Dated: May 7, 2012